Hon. Benjamin H. Settle
Submitted by: Petitioner/Plaintiff

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA**

| | | |
|---|---|---|
| LINDA CAPO, an single woman, | ) | NO.  C07-5685 BHS |
| | ) | |
| Petitioner/Plaintiff, | ) | |
| | ) | PETITIONER/PLAINTIFF |
| | ) | CAPO'S MEMORANDUM |
| v. | ) | IN SUPPORT OF HER |
| | ) | PETITION FOR REVIEW |
| PORT ANGELES SCHOOL DISTRICT | ) | |
| NO. 121; et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

NOW COMES Linda Capo, the petitioner/plaintiff, and in accordance with RCW 28A.405.320, RCW 28A.405.330 and the court's Minute Order dated February 6, 2008, hereby submits this memorandum in support of her Petition for Review.

## I. __INTRODUCTION__

. . . it would be manifestly unfair, besides illegal, to allow a discharge for insufficient cause.

*Hoagland v. Mount Vernon School
District No. 320, Skagit County.*

PETITIONER/PLAINTIFF CAPO'S
MEMORANDUM IN SUPPORT OF
HER PETITION FOR REVIEW - 1
[Case No. C07-5685 BHS]

As will be described below in detail, the Port Angeles School District terminated Linda Capo, a highly regarded and experienced high school special education teacher after she came to the educational and emotional aide of a substantially at-risk but high potential 15-year-old student. The original charges, including sexual misconduct, "sexual grooming," "boundary invasions," and "abandonment of generally recognized professional standards" were either abandoned by the District before the hearing or held by the hearing officer to be unsubstantiated. The hearing officer sustained the discharge for insubordination solely on the evidence of Ms. Capo's decision to resume tutoring the student after an investigation into the District's allegations was completed.

The hearing officer "consider[ed] this to be a tragic case because Ms. Capo is clearly an accomplished teacher and one with a big and expansive heart. Perhaps too big, perhaps too expansive." Hearing Officer's Oral Ruling dated October 30, 2007. TR IV 17:11-14.[1] Accomplished teachers with big and expansive hearts, of which fortunately there are many, are treasures in our society who must be encouraged and embraced for their selfless efforts on behalf of our children. The hearing officer's gratuitous observation is right on the mark; however, her conclusion that the School District had sufficient cause to terminate Ms. Capo constitutes reversible error.

---

[1] Citations to the transcripts will reference page(s) and line(s) by number so that Volume IV, page 17, lines 11-14 will appear as TR IV 17:11-14.

PETITIONER/PLAINTIFF CAPO'S
MEMORANDUM IN SUPPORT OF
HER PETITION FOR REVIEW - 2
[Case No. C07-5685 BHS]

THE ROSEN LAW FIRM
Suite 1200 Hoge Building 705 Second Avenue
Seattle, WA 98104-1798
(206) 652-1464

## II. RELIEF REQUESTED

Linda Capo respectfully requests that the court reverse the decision of the hearing officer because it was

    (4)     affected by error of law,

    (5)     clearly erroneous in view of the entire record submitted and by public policy contained in the act of the legislature authorizing the decision or order, and

    (6)     arbitrary.

RCW 28A.405.340. Alternatively, if the court believes that further proceedings are warranted it may remand the case for further proceedings.

If the court reverses the decision of the hearing officer, Ms. Capo further requests that it order the School District to immediately reinstate her to her former position as a special education teacher at the Port Angeles High School, make her whole for her lost wages and benefits, and, upon her post-order application, award her reasonable attorney's fees for the preparation and trial of her appeal, together with her attorney's fees and taxable costs in pursuing the Petition for Review.

Ms. Capo's requested relief is authorized by RCW 28A.405.340 and .350 and RCW 49.48.030.

## III. FACTUAL BACKGROUND

**A.**    **A Chronological History Of The Dispute Between Ms. Capo And The School District Leading To This Proceeding.**

    1.    On January 3, 2007, Ms. Capo was presented with a letter from the principal of the Port Angeles High School, Scott Harker, advising her that "concerns have been raised regarding your relationship with a Port Angeles High School student. I have

PETITIONER/PLAINTIFF CAPO'S
MEMORANDUM IN SUPPORT OF
HER PETITION FOR REVIEW - 3
[Case No. C07-5685 BHS]

THE ROSEN LAW FIRM
Suite 1200 Hoge Building 705 Second Avenue
Seattle, WA 98104-1798
(206) 652-1464

1   scheduled a meeting with you to discuss this matter." Capo Exh. 6.[2]

2       2.    On January 4, 2007, Michelle Reid, assistant superintendent at the Port

3   Angeles School District, met with Ms. Capo and presented her with a letter telling her

4   that she was being placed "on non-disciplinary, administrative leave with pay pending the

5   outcome, of an investigation." Capo Exh. 7. The notice went on to state:

6

7   > *In order to preserve the integrity of the District's investigation*, until
   > further notice you are directed not to contact or communicate in any way
8   > with current or former students of the District, current or former staff of
   > the District, and witnesses to the events of this investigation, except
9   > through this office.

10  *Id.* (Italics added.) Rather than "discuss this matter" as Mr. Harker had written in his

11  January 3 letter, Ms. Reid acknowledged that "not much" happened at the meeting.

12  Rather, Ms. Reid gave Ms. Capo the letter and:

13

14  > directed Ms. Capo that she was being placed on administrative leave and
   > that she was to have – I don't recall which exhibit that was – but
15  > essentially she was to have no further contact with Jeremiah and his
   > family, current or former students, current or former staff of the District.
16

17  TR II 162:20-163:1.

18      3.    The District retained Bellevue attorney Richard H. Kaiser to conduct an

19  investigation.[3] He submitted a report dated April 3, 2007. TR II 197:14-198:16.[4]

20

21  ———————————

22     [2] Exhibits referenced in this Memorandum will be identified by the party offering
    the exhibit and its number.

23

24     [3] Mr. Kaiser did not testify at the hearing.

25     [4] The report, District Exhibit 10, was admitted not for the truth of the matters
    asserted in it but for the purpose of the District's reliance on it. TR II 200:2-4.

26  PETITIONER/PLAINTIFF CAPO'S
    MEMORANDUM IN SUPPORT OF
27  HER PETITION FOR REVIEW - 4
    [Case No. C07-5685 BHS]

THE ROSEN LAW FIRM
Suite 1200 Hoge Building 705 Second Avenue
Seattle, WA 98104-1798
(206) 652-1464

4.      A Notice of Pre-Determination Hearing dated April 12, 2007 was delivered to Ms. Capo.  District Exh. 12.  Thereafter, she met with Port Angeles Superintendent Gary Cohn on May 24, 2007 to respond to his questions regarding the charges contained in the April 12 letter.  District Exh. 13.[5]

5.      On August 3, 2007 Superintendent Cohn issued a letter to Ms. Capo asserting probable cause for her discharge.  District Exh. 15.

6.      Ms. Capo appealed the Notice of Probable Cause for Discharge by letter from her attorney dated August 8, 2007 in which she made a request for a hearing pursuant to RCW 28A.405.300.  District Exh. 16.  Superintendent Cohn acknowledged timely receipt of the appeal in a letter to Ms. Capo dated August 24, 2007.  Capo Exh. 12.

7.      An evidentiary hearing was conducted by Justice (ret.) Faith Ireland between October 23 and 25, 2007.

8.      The District submitted its Proposed Findings of Fact, Conclusions of Law and Order on or about October 25, 2007.  Ms. Capo submitted her Proposed Findings of Fact, Conclusions of Law and Order on or about October 29, 2007.[6]

---

[5] Exhibit 13 was admitted over a hearsay objection as a prior statement of a party. TR II 16:3-17:4.  This constitutes an error of law.  The document is not the statement of Ms. Capo; rather, it is a transcript of what was purported to be a tape recording of the May 24 Loudermill meeting.  Likewise, the hearing officer erred by admitting the tape prepared by Mr. Kaiser during the investigation.  She overruled the objection for the same reason.  TR II 9:1-19.  (Counsel for the District is quoted in the transcript as offering District Exhibit 10B.  He either misspoke or the transcript is in error.  Clearly, he was referring to Exhibit 10A, the transcript of the investigation.)  This issue will be discussed below.

[6] The parties' Proposed Findings, Conclusions and Order are included with the materials the District filed with the Clerk's Office pursuant to the court's Order of February 6, 2008.

PETITIONER/PLAINTIFF CAPO'S
MEMORANDUM IN SUPPORT OF
HER PETITION FOR REVIEW - 5
[Case No. C07-5685 BHS]

THE ROSEN LAW FIRM
Suite 1200 Hoge Building 705 Second Avenue
Seattle, WA 98104-1798
(206) 652-1464

9.      The hearing officer issued her Oral Decision on October 30, 2007.  TR IV 3:5-19:23.  Her Findings of Fact, Conclusions of Law and Order dated November 6, 2007 is found at Exhibit 1 to the Complaint filed in this lawsuit.

10.      Ms. Capo filed her Petition for Review on November 29, 2007 in accordance with RCW 28A.405.320 in Clallam County Superior Court.  The District removed the lawsuit to federal court on or about December 12, 2007.

11.      Ms. Capo moved for remand of her petition to state court or in the alternative for expedited proceedings on January 11, 2008.  The District joined in the alternative request.  The motion for expedited proceedings was granted and the court subsequently issued a Minute Order on February 6, 2008 directing the filing of the record and establishing a briefing schedule.

**B.      Linda Capo's Background.**

Linda Capo has been a teacher since 1967.  She holds valid teaching credentials in both New York and Washington.  She taught in New York from 1967 to 1996 excluding approximately 14 years from the late 1970s to 1993 when she gave birth to and began raising four children.  She was highly regarded as a teacher by colleagues and administrators.  In 1996 Ms. Capo moved from New York to Washington and worked as a substitute teacher in Seattle area schools during the 1996-97 academic year.  Finding of Fact 3.

In 1997 Ms. Capo was hired as a full-time special education instructor by the Port Angeles School District.  Ms. Capo acted as a Chair of the Special Education Department between about 1999 and 2003.  Ms. Capo received annual evaluations which never

PETITIONER/PLAINTIFF CAPO'S
MEMORANDUM IN SUPPORT OF
HER PETITION FOR REVIEW - 6
[Case No. C07-5685 BHS]

THE ROSEN LAW FIRM
Suite 1200 Hoge Building 705 Second Avenue
Seattle, WA 98104-1798
(206) 652-1464

1    assessed her at a level below satisfactory and often praised her performance.  Finding of

2    Fact 4.

3            Ms. Capo regularly extended herself to at-risk, underprivileged and special needs

4    children by providing them with tutoring and ministering to their health and welfare by

5    arranging for medical treatment, food, and clothing.  She had a reputation for caring and

6    being concerned for students.  There is no evidence that prior to this matter Ms. Capo was

7    being concerned for students.  There is no evidence that prior to this matter Ms. Capo was

8    ever accused or suspected of inappropriate behavior with students.  Finding of Fact 5.

9            At all times relevant, Linda Capo was a permanent certificated employee of the

10   Port Angeles School District, teaching special education at Port Angeles High School.

11   Finding of Fact 1.

12

13   **C.    The District's Charges Against Ms. Capo.**

14           On January 4, 2007 the District notified Ms. Capo that it had a concern that she

15   "may be engaged in an inappropriate relationship with a Port Angeles High School

16   student."  District Exh. 8.

17           On April 12, 2007, in its Notice of Pre-Determination Hearing, District Exh. 12,

18   the District wrote:

19

20                           I. Allegations Against You

21           In December 2006, certain allegations of misconduct and
     unprofessional conduct on your part were brought to the District's
22   attention and you were placed on paid administrative leave.   An
     investigation was conducted which yielded preliminary findings that you
23   have engaged in boundary invasion behaviors with a student JH, including
     twice sleeping in his bedroom and in his bed with JH present in the room
24   and no other adults present; spending the night in the same location with
     JH on several occasions; giving inappropriate gifts to JH; going places
25   alone with him; taking a peculiar and unhealthy interest in him, riding in

26

27   PETITIONER/PLAINTIFF CAPO'S
     MEMORANDUM IN SUPPORT OF
     HER PETITION FOR REVIEW - 7
     [Case No. C07-5685 BHS]

THE ROSEN LAW FIRM
Suite 1200 Hoge Building 705 Second Avenue
Seattle, WA 98104-1798
(206) 652-1464

an automobile alone with him and allowing him to drive your car without a license or learner's permit; inappropriately drafting a guardian complaint and medical authorization and other matters you were questioned about in your interviews with Rick Kaiser.

This misconduct, if true, could constitute unprofessional conduct on your part in violation of WAC 181-87-080, boundary invasion behavior conduct with a student, as well as WAC 181-87-060, disregard and abandonment of generally recognized professional standards.[7]

While the District refers to the violation of WAC 181-87-080 as "boundary invasion behavior conduct with a student," the Code provision to which it refers, WAC 181-87-080, is entitled "Sexual Misconduct with Students." It is attached hereto in its entirety as Appendix A. It is significant that while the District continued to allude to this provision and refer to Ms. Capo's conduct as possible "sexual grooming" of the student, it did not claim a violation of this provision in the Notice of Probable Cause, strongly suggesting that it was well aware of the fact that there was no evidence that Ms. Capo was exploiting the student, sexually or otherwise, and that its directive that she have no contact with him was unnecessary to protect either the student or the District.[8]

In its letter of probable cause dated August 3, 2007, the District identified three charges against Ms. Capo:

---

[7] The hearing officer determined that none of these charges were established by a preponderance of the evidence. TR IV 13:30-16:19; hearing officer's Conclusion of Law 1.

[8] Neither did the District contact state officials to report sexual misconduct as it is required to do if it reasonably believes such behavior is occurring.

PETITIONER/PLAINTIFF CAPO'S
MEMORANDUM IN SUPPORT OF
HER PETITION FOR REVIEW - 8
[Case No. C07-5685 BHS]

THE ROSEN LAW FIRM
Suite 1200 Hoge Building 705 Second Avenue
Seattle, WA 98104-1798
(206) 652-1464

First Charge - *Unprofessional Conduct - Boundary Invasion Behaviors* (WAC 181-87-060).[9]

Second Charge - *Unprofessional Conduct - Extreme Poor Professional Judgment* (WAC 187-81-060) [sic][10]

Third Charge - *Unprofessional Conduct* - Serious Insubordination.

In its hearing brief the School District wrote "Ms. Capo is charged with unremediable misconduct.  She is not being terminated for remedial job performance issues. . . . Ms. Capo's misconduct is unremediable as it materially and substantially affects her future performance as a teacher in the District and lacks any positive educational aspect or legitimate professional purpose." Port Angeles School District's Hearing Brief, at 1-2.[11]

The hearing officer sustained only the third charge.

**D.   The Hearing Officer's Findings.**

**1.      The undisputed findings.**

Neither party has challenged a majority of the hearing officer's findings of fact. These undisputed findings include, in addition to those cited above describing Ms. Capo's background, the following:

---

[9] This is where the District has dropped the allegation that Ms. Capo violated WAC 181-87-080 as discussed immediately above.

[10] While this erroneous citation has been corrected by an interlineation on Exhibit 15 filed with the court, that interlineation was not part of the exhibit as proposed by the District at the hearing.  The reference should be to WAC 181-87-060.

[11] Attached as Exh. 1 to the Declaration of Jon Howard Rosen filed in this court on January 30, 2008 in support of Ms. Capo's Motion for Remand or Expedited Proceedings.

PETITIONER/PLAINTIFF CAPO'S
MEMORANDUM IN SUPPORT OF
HER PETITION FOR REVIEW - 9
[Case No. C07-5685 BHS]

THE ROSEN LAW FIRM
Suite 1200 Hoge Building 705 Second Avenue
Seattle, WA 98104-1798
(206) 652-1464

. . .

2.  The student identified as LB[12] in this matter was a 15-year-old boy who was a student at Port Angeles High School during both the 2006-07 and 2007-08 school years.

. . .

6.  Near the end of the 2005-06 school year, Ms. Capo requested referrals from her students for anyone they knew who had experience with meth addiction as she wanted to do an interview for a book she planned to write. Ms. Capo has written several books, including co-authoring a published textbook on grammar and composition.

7.  L.B., a 15 year old sophomore, was introduced to Ms. Capo by one of her students in the spring of 2006. L.B. has been on probation for misdemeanor violations. He is a recovered methamphetamine user. He has alcohol problems. Prior to tutoring by Ms. Capo, he was failing virtually all of his subjects. He turned 16 years old in April 2007.

8.  Some months after meeting L.B. and after getting permission from his guardian, Ms. Capo interviewed him away from school in the fall of 2006 more than a dozen times and audio taped his recollections of events in his life. Early in the project, as Ms. Capo heard the story of L.B.'s tumultuous upbringing, it was decided the project would be to tell his life story. Ms. Capo began to know L.B.'s family including his 83 year-old great grandmother Vera, (last name omitted for privacy) who was his guardian, her husband, who was dying of cancer and his two older brothers, Melvin and Jason. Melvin who was 18, lived in a 19 foot travel trailer with his girlfriend, who was 17. Jason, Melvin and L.B. were close siblings in spite of frequently being split up due to their being shuffled from relative to relative or living on the streets without housing.

9.  The tapes produced and transcribed tell two stories. The first tape (and transcript called Fun Stuff) is a jocular romp through the young life of L.B. where he tries to portray as hilarious adventure his introduction to whiskey by his parent at age 4, first drug high at age 6, family violence, life and fights on the streets, living in the woods behind the projects or in a loft with a stripper pole. Ms. Capo can be heard laughing and encouraging him in his narrative. The tape (transcript called

_____

[12] The student's actual initials are JH.

THE ROSEN LAW FIRM
Suite 1200 Hoge Building 705 Second Avenue
Seattle, WA 98104-1798
(206) 652-1464

Overview) is a more sober and sensitive review of the same life with all of the violence, hurt, humiliation, love, raw tragedy and poignancy of L.B.'s life and family exposed. Ms. Capo is heard empathizing and drawing L.B. out.

10.     Ms. Capo took a great interest in L.B. who she believed had considerable intelligence and potential. She described him as charismatic, funny and a pleasure to spend time with. Another teacher, Mr. Anderson,[13] also characterized LB as charismatic. Although he was not her student, Ms. Capo arranged to tutor him in her fourth period preparation time even though he was assigned as an assistant in guidance counseling. She communicated with his teachers about his assignments and progress. When the assistant principal reassigned L.B. to the attendance office as an assistant, Ms. Capo wrote a letter of objection for his guardian, Vera to sign and for L.B. to present to the school. She also drafted a letter for his guardian to sign, authorizing L.B. to ride in her car and be at her home. It stated that Ms. Capo and L.B. were writing an autobiography and gives permission for her to tape record his account of his life. It also provides that Ms. Capo has the guardian's permission, in the event of an emergency, to take L.B. to a physician or hospital.

11.     Ms. Capo and L.B. had a teacher-student relationship based on the fact that she was a teacher, she met him through her job as a teacher, and she interacted with him as a teacher at school in tutoring him during fourth period. As a student reporting to her 4th period, L.B. was under Ms. Capo's supervision, direction and control during that class. He

---

[13] Kanyon Anderson testified with regard to why he considered the student to be "incredibly charismatic." He said, among other things, "He's critically evaluating the things that a lot of kids don't even think about. Like he critically evaluates policies at the high school, whether or not this is an appropriate policy or not. And most kids just blindly accept that's the rule and I do what I'm told. Jeremiah I think comes at things with a bit more of an adult perspective that he is willing to look at the world around him and decide I like this, I don't like this. And I think that's something a lot of people don't learn until they're older that it is okay to challenge things you don't like. It's refreshing to talk to a teenager who's thinking as much as Jeremiah is." TR III 85:19-86:7  He also testified that he attributed Ms. Capo's work with the student "as influencing his maturization and improvement over this last year." He went on to say, "And I told him that this is by far the best piece of writing I have ever seen you do, Jeremiah. And he said, oh, yeah, that's because Capo made me re-work the introduction five to six times. I spent a ton of time on this. Capo told me it didn't make any sense and that I had to redo it and she told me it still didn't make any sense and I had to redo it again. So he was smiling when he was saying about that." TR III 86:22-87:10.

PETITIONER/PLAINTIFF CAPO'S
MEMORANDUM IN SUPPORT OF
HER PETITION FOR REVIEW - 11
[Case No. C07-5685 BHS]

THE ROSEN LAW FIRM
Suite 1200 Hoge Building 705 Second Avenue
Seattle, WA 98104-1798
(206) 652-1464

was therefore by law a student of Ms. Capo (WAC 181-87-040(1).)  In addition, the fact that Ms. Capo was a teacher in the District and the fact that L.B. was a student in the District created a teacher-student relationship between them.  (WAC 181-87-040(2).)

. . .

22.     At first Ms. Capo abided by the stay away order.  However, somewhere in the spring, before April 12, Ms. Capo began violating the order by having L.B. at her house after school, about four afternoons a week for tutoring.  He was failing all his classes and, according to his testimony, had been told by his probation officer that he would spend the summer in detention if he did not pass.  Ms. Capo was given a further stay-away directives on February 12 and April 12, 2007.  Ms. Capo acknowledges that she knew that she was in violation of the District's stay away orders and that they had not been eliminated.

. . .

25.     L.B. testified that Ms. Capo has helped him greatly.  He brought his grades up to passing before year end.  He is currently getting B's in school.  He said this was some pride and also gave an example of how she has improved his judgment and ethics.  He is back living with his remarkable guardian and great-grandmother, Vera.  Vera also testified as to how much she believes that Ms. Capo has helped L.B.  Although she is 83 and lost her husband last winter, Vera presented as competent, sharp, loving, and capable.

. . .

27.     As to the first charge concerning "Boundary Invasions" there is no evidence that the District had any policy, rule, guideline, standards or training about "boundary invasion" for its teachers. Michele Reid testified that no policies about teachers staying at student's home or vice verse should be necessary.  It's just "common sense."

. . .

29.     . . .

The absence of information defining "boundary invasion" and setting standards deprives District employees of advance knowledge of what they are prohibited from doing.  In the absence of policies,

PETITIONER/PLAINTIFF CAPO'S
MEMORANDUM IN SUPPORT OF
HER PETITION FOR REVIEW - 12
[Case No. C07-5685 BHS]

guidelines, or training on such boundary invasion, the District has failed to prove by a preponderance of the evidence that the behavior here constitutes misconduct sufficient for termination without remediation.

. . .

31.     As to Charge Two (–poor judgment, conduct "in flagrant disregard or clear abandonment of generally recognized professional standards,") it is the lack of evidence about what are the generally recognized professional standards where the District's proof fails.  If the hearing officer is simply to exercise his or her judgment, the outcome is subject to mere personal opinion and not professional standards.  The language of Charge Two "using her relationship with L.B. to meet her own inner needs" has not been proved by a preponderance of the evidence.  The evidence is as susceptible to finding Ms. Capo's actions those of a mentor or surrogate parent as of meeting her own inner needs.  The District has not proved an improper motive.  That part of Charge Two concerning violation of the stay-away order is subsumed in Charge Three which has been found for the District.[14]

**2.     Ms. Capo has challenged the following Findings:**

. . .

21.     Given the information the District had received, the District was justifiably concerned about Ms. Capo's relationship with L.B. and it was reasonable for the District to place Ms. Capo on administrative leave on January 4, 2007 to investigate that relationship.  Ms. Capo was given oral and written directives on that day to remain away from L.B. among others.

. . .

23.     The District's stay-away orders concerning L.B. were made in good faith and it was reasonable pending this hearing which was held on October 23-25, 2007.  Even though the investigation was basically concluded by Aug. 3, the stay-away order was not eliminated.  Given that L.B. was likely to be a witness to the case, it was reasonable that the orders continue.  In fact, Ms. Capo acknowledges that she showed the probable cause letter to L.B. who researched the cited cases and formed

---

[14] There are other undisputed findings as well.  However, given the hearing officer's Findings 27 and 31 and Conclusion 1, they are not material to this petition.

THE ROSEN LAW FIRM
Suite 1200 Hoge Building 705 Second Avenue
Seattle, WA 98104-1798
(206) 652-1464

1    opinions about the District's case.

2        24.    The stay away directives were lawful.  Ms. Capo as an
3    employee of the District was therefore required to obey those directives.

4                                . . .

5        26.    Despite her efforts to help L.B. and the apparent benefit,
6    I find that Ms. Capo's decision to disregard the stay-away orders
     constitutes serious insubordination and justifies the District terminating
7    her employment. Ms. Capo made the decision with full knowledge of the
     consequences as she testified in this hearing "as a matter of conscience."
8    In the May 24, 2007 interview with Dr. Cohn, Ms. Capo said "...I right off
     the bat when I met him determined I would show him steadfastness,
9    because I could hear how person after person in his family betrayed
10   him."[15]

11   _____

12   [15] Ms. Capo also testified:
        Q.    When you started working with Jeremiah and seeing him
13   on a regular basis I think you said in about April of this year.
        A.    Yes.
14      Q.    Now what was you reason or reasons for reinstituting \
15   contact with him?
        A.    I was convinced that I was a good role model for him.  I
16   knew I brought stability to his life and I strongly suspected that
     his grades were not in very good shape.  It was a matter of
17   conscience.  I understood the District's directive and thought it
     was wrong to adhere to it.
18      Q.    Had you ever had any discussions with Ms. Reid about
19   the length of the restriction?
        A.    I called her a week or two after I was first placed on leave
20   and asked her how much longer she thought it would take and
     she thought it would be over in a week or two.
21          I also on the day that I went in to pick up the report from
22   Mr. Kaiser, Mrs. Reid told me the gag order would be over and
     she said Dr. Cohn had finished his investigation.
23      Q.    Now as far as was there any further investigation to your
     knowledge after Mr. Kaiser submitted his report?
24      A.    Not to my knowledge.

25   TR II 129:5-130:7

26

27   PETITIONER/PLAINTIFF CAPO'S
     MEMORANDUM IN SUPPORT OF
     HER PETITION FOR REVIEW - 14
     [Case No. C07-5685 BHS]

THE ROSEN LAW FIRM
Suite 1200 Hoge Building 705 Second Avenue
Seattle, WA 98104-1798
(206) 652-1464

. . .

29.   . . .

The testimony of Mr. Kahn was admissible to show the reasonableness of the District's actions in placing Ms. Capo on administrative leave and in issuing and continuing its stay away order in regard to L.B. However, the court finds the testimony inadmissible for purposes of determining whether Ms. Capo has committed misconduct in charges two and three. *State v. Braham*, 67 Wn. App. 930, 937-38, 841 P.2d 785 (1992) (use of general expert testimony concerning grooming evidence impermissibly implied defendant's guilt and was generally without value.) Although this is not a criminal case, and not a jury trial *State v. Braham* should apply here as well.

. . .

30.   Ms. Capo argues that the term "boundary invasion" is unconstitutionally vague. In view of the foregoing finding, this issue need not be addressed.[16]

Ms. Capo will argue below the bases for her claim that there is no substantial evidence to support the hearing officer's Findings that the stay away order was reasonable or initially made in good faith. She will also argue that there was no substantial basis to maintain the order, even if it was originally justified, after attorney Kaiser's investigation was concluded, a point up to which Ms. Capo had fully complied with the order despite the pleas from and detriment to the at-risk student.[17] Lastly, even if the order banning Ms. Capo from contact with the student was reasonable, there is a lack of evidence that substantial cause existed to terminate Ms. Capo for violating the directive.

---

[16] Since the District has not challenged any of the hearing officer's Findings and Conclusions with regard to Charges One and Two, whether the hearing officer erred with regard to Finding 30 is moot.

[17] See TR III 55:22-57:25.

PETITIONER/PLAINTIFF CAPO'S
MEMORANDUM IN SUPPORT OF
HER PETITION FOR REVIEW - 15
[Case No. C07-5685 BHS]

As will be shown below, some of the disputed Findings of Fact are in reality conclusions of law (see Findings 24, 26 and the third paragraph of 29).

**E.**   **Facts The District Knew Or Could Reasonably Infer On January 4, 2007, The Date It Placed Ms. Capo On Administrative Leave And Directed Her To Have No Contact With Present Or Former Port Angeles School District Students, Families  Or Present And Former Faculty.**

The record reveals that on January 4, 2007 the District's administrators had no reasonable basis to believe that there was any legitimate justification to deprive Ms. Capo of contact with what was virtually the entire Port Angeles community.  The testimony of what the District's witnesses know or could reasonably infer as of January 4, 2007 is instructive.

**Michelle Reid**

Q.   Thank you.  Did you have occasion to become involved in an investigation into Ms. Linda Capo?
A.   I did.
Q.   And how were you brought into that?
A.   Dr. Cohn requested that I begin – actually, I believe the term he used was placed.  He placed me as the point person on the situation in late December of 2006.
Q.   What is the first thing that you did – did you then conduct an investigation or begin an investigation?
A.   I did.
Q.   And what is the first thing that you did?
A.   The first conversation I had related or first piece of investigation, if you will, was I met with Jeremiah in Scott Harker's office on December 21st.
Q.   What occurred during that meeting?
A.   There were actually several reasons for the meeting, several of which were not initiated by me.  It was my understanding that Jeremiah had a concern about his schedule and also about the supervisory assignment, which administrative staff members at the high school who oversee any disciplinary activities connected to his behavior.  And my purpose ostensibly in meeting with Jeremiah was to determine if there had been any activity between

PETITIONER/PLAINTIFF CAPO'S
MEMORANDUM IN SUPPORT OF
HER PETITION FOR REVIEW - 16
[Case No. C07-5685 BHS]

THE ROSEN LAW FIRM
Suite 1200 Hoge Building 705 Second Avenue
Seattle, WA 98104-1798
(206) 652-1464

1          him and Linda Capo that would lead me to believe that there was
2          something untoward going on in the relationship.
              . . .

3    Q.    What was your purpose in the meeting?
4    A.    My purpose?
    Q.    Your purpose.
5    A.    To question – well, to meet Jeremiah Hilt and to question him
           with regard to his relationship with Linda Capo.
6    Q.    And did you do that?
7    A.    Yes.
    Q.    What did he tell you?
8                . . .

9    A.    Would you repeat the question?
10   Q.    Well, I'm going to ask you what you were told but do you need
           your notes?
11   A.    I'm looking for that while I was – I found them.  So I'm
           responding to what I was told by Jeremiah in that meeting?
12   Q.    Correct.
13   A.    Okay.
              . . .

14   Q.    What you were told by Jeremiah on 12-21-06?
15               . . .

16   A.    And so Jeremiah indicated that he had been assigned as a guidance
17         TA.  The meeting started with the conversation around the TA
18         issue that he'd been a guidance office TA, there hadn't been much
           work in the guidance office so he had been doing some tutoring in
19         fourth period with Ms. Capo.  *That he believed he was bringing*
           *his grades up and that was a situation that he rather preferred to*
20         *being an office aide.*  I asked about whether or not Jeremiah had
           been receiving rides either to or from school.  *Jeremiah affirmed*
21         *that indeed he's been given rides home by Ms. Capo.*  I asked
22         about a book that supposedly was being written.  *Jeremiah*
           *responded that he was being interviewed for purposes of writing*
23         *a book with Ms. Capo on the effects of meth addiction.  He*
           *indicated they'd met 15 or more times to work on this paper or*
24         *story.  That she had worked in his great-grandmother's home.*
           *That she would bring a laptop and they would work there often.*
25         *I asked if he had worked at Ms. Capo's house and he had*
           *indicated that yes, he had.  That he'd also helped her dig up a*
26

27 PETITIONER/PLAINTIFF CAPO'S
   MEMORANDUM IN SUPPORT OF
   HER PETITION FOR REVIEW - 17
   [Case No. C07-5685 BHS]

THE ROSEN LAW FIRM
Suite 1200 Hoge Building 705 Second Avenue
Seattle, WA 98104-1798
(206) 652-1464

*septic tank. That she was in the process of selling her home.* I asked Jeremiah if on any occasion either Ms. Capo had spent the night at his great grandmother's home or whether or not he had spent the night at her home. He said never – he had never spent the night overnight at her home nor had she at his. *I asked how he contacted or how he met Ms. Capo. He indicated Caleb Conley had introduced them. That he had been in a class of Ms. Capo's the spring before and had heard that she was writing a book on meth and had thought that would be a good opportunity for Jeremiah to meet with her and work with her.* I asked Jeremiah at that time if there were any plans for contact with Ms. Capo over the winter break. I want to make sure that I noted on December 21st we were in winter break at that point, that was no longer a school time. Jeremiah at that point assured me that no, indeed, he had no plans to contact Ms. Capo over the winter break, nor was he aware of any plans she hd. *So my notes – and that was essentially the end of the conversation with Jeremiah that I had. And he left.* The meeting was at noon. *The meeting went maybe 20, 30 minutes by the time we covered several topics.* So my notes would reveal that.

Q.    And then did you conduct further investigation following that?

A.    I did.

Q.    And what was the next stage in your investigation?

. . .

Q.    When was the next time you spoke with Ms. Capo?

A.    *I believe the next time I spoke with Ms. Capo was January 4th.*

Q.    And where did that conversation take place?

A.    You know, in the deposition I seemed to indicate I wasn't clear if it was Scott Harker's office or an office downtown, but it was in an office with Ms. Capo and Mary Burnette, the union president, present.

Q.    *What was said during that meeting?*

A.    *Not much.* Essentially that was the meeting where I delivered or directed Ms. Capo that she was being placed on administrative leave and that she was to have – I don't recall which exhibit that was – but essentially she was to have no further contact with Jeremiah and his family, current or former students, current or former staff of the District.[18]

---

[18] This testimony was on direct examination by the District's counsel.

PETITIONER/PLAINTIFF CAPO'S
MEMORANDUM IN SUPPORT OF
HER PETITION FOR REVIEW - 18
[Case No. C07-5685 BHS]

THE ROSEN LAW FIRM
Suite 1200 Hoge Building 705 Second Avenue
Seattle, WA 98104-1798
(206) 652-1464

TR II 155:9-163:1 (italics added).

. . .

Q.   You met with Jeremiah on the 21st of December, correct?
A.   That's correct.
Q.   And you met with him again on the 24th or so – 26th of January?

A.   That's correct.
Q.   Had you met with him at any time prior between those two dates?
A.   Not to my knowledge.  Not that I recollect.[19]

TR II 182:22-183:5.

**Gary Cohn**

Q.   Dr. Cohn, at some point did it come to your attention an issue
       concerning Linda Capo and a relationship with a student,
       Jeremiah?
A    yes.
Q.   And how did you become aware of this?
A.   *I believe the first time the issue arose for me was when Linda*
       *spoke with Mark Jacobson about transporting the student in her*
       *vehicle.  That's my recollection.*
Q.   What actions did you take after this information?
A.   It wasn't that I specifically took individual action.  I know that I
       listened to Mark's concern over what he's heard.  I know that I
       had been a bit concerned about the circumstances as I understood
       them at the time and asked that he be clear about his instructions
       and that he contact risk management to notify them about what
       we'd learned and ask their advice with respect to a response.  And
       it was my understanding that he did that.
Q.   Did you direct that an investigation be performed?
A.   I do not recall directing an investigation be performed at that time
       with that information, no.[20]

TR II 195:24-196:22 (italics added).

**Mark Jacobson**

---

[19] This testimony was on cross-examination by Ms. Capo's counsel.

[20] Testimony of Dr. Cohn during cross-examination by Ms. Capo's counsel.

PETITIONER/PLAINTIFF CAPO'S
MEMORANDUM IN SUPPORT OF
HER PETITION FOR REVIEW - 19
[Case No. C07-5685 BHS]

THE ROSEN LAW FIRM
Suite 1200 Hoge Building 705 Second Avenue
Seattle, WA 98104-1798
(206) 652-1464

1  Q.   On or about December 8th, 2006 did you have a meeting with Linda Capo?

2  A.   Yes, I did.

   Q.   How did that come about?

3  A.   If I recall, she called the office and wanted to know if I'd be available that afternoon.  She had a risk management question for

4       me.

5  Q.   What is risk management?

6  A.   Risk management has to do with insurance procedures or risks that involve school districts and personnel.

7  Q.   Did you meet with her?

8  A.   Yes, I did.

   Q.   And did she have any documents with her?

9  A.   Not that I recall.

   Q.   Could you turn to District Exhibits – turn to tab 10 and then you'll

10      find letters behind those tabs and 10E; have you seen that letter before?

11 A.   I don't know if I have seen the letter, but she referenced she could

12      get a letter or the grandparents were willing to write a letter to allow their grandson to ride with her.  And matter of fact, I did not

13      see the letter.  She said she'd provide me a copy if I wanted one or could get a letter from them.

14 Q.   Could you turn – well, did she bring any letters at all with her into

15      that meeting?

   A.   Not that I recall.

16 Q.   What conversation did you have with her?

17 A.   *She asked me or indicated that she was going to be working with the student on a book and said she was looking at driving him and*

18      *back and forth to his grandparents' house and wanted to know if that would be an issue.*  What I stared  [sic] with her is that I

19      would never put a child in my personal car, nor would I be alone with a student unless the grandparents were there in the home.  I

20      have been telling staff for the – since I was superintendent and the rules changed back in 1992 or '93 on whether you could transport

21      a student.  You used to be able to do that with a special license or training.  Since then we always don't put them in a car unless it is

22      a matter of life and death.

23 Q.   An emergency?

   A.   An emergency situation where they'd be hospitalized if you didn't

24      take action.

25 Q.   Did you have any other conversation with Ms. Capo at that time?

   A.   *She had mentioned going to the house and working with a student.*

26

27 PETITIONER/PLAINTIFF CAPO'S
   MEMORANDUM IN SUPPORT OF
   HER PETITION FOR REVIEW - 20
   [Case No. C07-5685 BHS]

THE ROSEN LAW FIRM
Suite 1200 Hoge Building 705 Second Avenue
Seattle, WA 98104-1798
(206) 652-1464

1   And I had emphasized to her at that point in time that I wouldn't
2   ever put myself in a situation where I put my profession at
    question or my professionalism in question. And then there was
3   a little bit of conversation about whether it was after school hours
    or during school hours if that made a difference.

4   Q.   Do you recall what that conversation was?
    A.   Yes, I shared with her I wouldn't put myself in a situation that
5        would cause any question whatsoever. I said the schools aren't in
         control of you 24 hours a day, but you're still viewed as a
6        certificated staff member and expectations are that that's how you
7        behave.[21]

8   TR II 149:11-151:21 (italics added).

9   **Maryanne Unger**

10  Q.   In December 2006 did anything occur regarding a particular
11       student of Ms. Capo?
    A.   *My recollection is going into Ms. Capo's class and noticing that*
12       *a student was in the classroom I didn't expect to be there at that*
         *time.*
13  Q.   *The student, I'm going to call him J. The student, had you been*
14       *aware that he had been in Ms. Capo's classroom prior to this*
         *time?*
15  A.   *I did not.*
    Q.   You knew this student?
16  A.   I did.
    Q.   Do you know where that student was regularly assigned for fourth
17       period?
18  A.   He was regularly in the schedule in the computer he was
         scheduled to be an office TA for the guidance office.
19  Q.   So when you saw this student in Ms. Capo's classroom do you
         recall if she was present at that time?
20  A.   I don't believe she was there at that time.
21  Q.   And so what did you do at that time?
    A.   Noticing that he was there and knowing that he was an assistant
22       in the guidance office I asked why he was there. And also asked
         if he might be interested in being an assistant in the attendance
23       office because our office did not have a helper during that period.
24  Q.   So you were shorthanded?
    A.   We were shorthanded in the attendance office.

25  _____

26  [21] Direct examination by the District's counsel.

27  PETITIONER/PLAINTIFF CAPO'S
    MEMORANDUM IN SUPPORT OF
    HER PETITION FOR REVIEW - 21
    [Case No. C07-5685 BHS]

THE ROSEN LAW FIRM
Suite 1200 Hoge Building 705 Second Avenue
Seattle, WA 98104-1798
(206) 652-1464

1     Q.     So what occurred next?

      A.     He said that that seemed okay to him at that time.  And so I

2           suggested that we check with his counselor, Ms. Jacobs, to see if

          that was, you know, if it was reasonable.  And if it was just a

3           temporary thing, if he wasn't needed in the guidance office or if

          they really didn't need another office TA.

4

                          . . .

5

6     Q.     So what action did you take with respect to this student, J?

      A.     I don't recall if the student went with me to the guidance office or

7           I went alone to discover if it was possible for him to change his

          assistantship from the guidance office to the attendance office.

8           But that was my next step to check and see if that was a

          possibility.

9     Q.     What was the ultimate outcome?

      A.     He was reassigned to the attendance office.

10     Q.     What was your motive in reassigning him?  Did you have any

          motive of retribution against Ms. Capo in doing that?

11     A.     I did not.

12     Q.     What was your reason for having him assigned to the attendance

          office?

13     A.     We did not have a student that would carry notes from classroom

          to classroom during that period.[22]

14

15 TR II 144:6-146:19 (italics added).

16     To summarize the testimony, as of January 4, 2007, the District was aware that

17 Ms. Capo had been:

18

19     •    tutoring an at-risk student;

20     •    interviewing him with regard to a book she was writing;

21     •    advocating that he be assigned to her classroom for tutoring during her

22         fourth period planning class;

23     •    seeking permission, along with his great-grandmother, to transport the

24         student in her car before and after school hours;

25

26     [22] Direct examination by the District's counsel.

27 PETITIONER/PLAINTIFF CAPO'S
MEMORANDUM IN SUPPORT OF
HER PETITION FOR REVIEW - 22
[Case No. C07-5685 BHS]

THE ROSEN LAW FIRM
Suite 1200 Hoge Building 705 Second Avenue
Seattle, WA 98104-1798
(206) 652-1464

1    It is abundantly clear that prior to placing Ms. Capo on administrative leave and

2  gagging her there is no evidence that any school district representative spoke with

3  Ms. Capo or Vera Hilt, Jeremiah's great-grandmother and custodial relative, or spoke

4  with or received any complaints from any family member or community source. Neither,

5  importantly, is there evidence that even suggests that District administrators knew or had

6  reasonable belief to suspect on or before January 4, 2007 that Ms. Capo had slept in the

7  student's bedroom or the student's brother's trailer, allowed him and his brother and/or

8  friends sleep at her home, that she had given him Christmas gifts, or that she had allowed

9

10  him to drive her car as the hearing officer later concluded to be neither unprofessional

11  conduct, boundary invasion behaviors, or extreme poor professional judgment.

12  **F.**   **The District Has Relied On Hoagland Factors To Support Its Termination**
13       **Of Ms. Capo For Insubordination At Every Step In The Process.**

14       In the probable cause letter of August 3 Dr. Cohn states:

15
16       *Each of the charges against you arises out of instances of your*
         *misconduct, not job performance.* As such, each of the charges relates to
17       unremediable conduct as that term is defined by law. . . .

18       Certificated employees may be disciplined for conduct which occurs away
         from school when there is sufficient connection between the misconduct
19       and service as a public school teacher. (*Hoagland v. Mount Vernon*
         *School District* . . .; *see also* WAC 181-86-080 . . . .)
20

21  District Exh. 15 at 6 (italics added). This language was repeated in the District's hearing

22  brief, as indicated *supra*, at page 7. Further on in the brief while "applying" the

23  *Hoagland* factors in the context of the insubordination charge it wrote:

24       **a. (2)  Likelihood of Detriment:** . . . Ms. Capo can no longer be trusted
25       around students.  She not only does not understand what
         appropriate boundaries are, she willfully defies the oral and

26

27  PETITIONER/PLAINTIFF CAPO'S
    MEMORANDUM IN SUPPORT OF
    HER PETITION FOR REVIEW - 23
    [Case No. C07-5685 BHS]

1    written directives or [sic] her superiors aimed and requiring her to
2    respect such boundaries.

3    *Id.* at 3.

4        **g.**   Other teachers are now aware of this case and have been asked to
5    testify.  Whatever occurs with Ms. Capo will be an example to
     them as far as respecting boundaries are concerned, or obeying the
6    superintendent's directives.

7    *Id.* at 5.

8        **(5)**   **Extenuating or Aggravating Circumstances:**  . . . She has
9    shown the boy that what everyone feels is more important than
     what one's supervisor says by flagrantly disobeying directives to
10   stay away from the boy.

11   *Id.*

12       **(6)**   **Likelihood that the Conduct will be Repeated:**  . . . She has
13   demonstrated that she will do as she desires rather than as she is
     directed, thus demonstrating that the conduct is likely to be
14   repeated, and that it is both as a matter of law and fact
15   unremediable.

16   *Id.*

17       **(8)**   **Possible Chilling Effect:**  Teachers do not have the right to . . .
18   disobey lawful and reasonable directives of the District. . . . (b)
     defies the Superintendent's reasonable directives aimed at
19   protecting a student.

20   *Id.* at 6.

21       **(11)**   **Fitness to Teach:**  Ms. Capo's failure to abide by directives, and
22   her engaging in a relationship which takes on the appearance of
     sexual grooming, and is very much a peer-to-peer type
23   relationship, is disturbing enough.  But her refusal to take
     direction from her superintendent and stay away from the boy
24   involved is outrageous and demonstrate that she is not fit to
     continue as a teacher in the District. . . . The bottom line is that a
25   teacher who will not follow the reasonable directives of the
     superintendent meant to protect the health and safety of students
26

27   PETITIONER/PLAINTIFF CAPO'S
     MEMORANDUM IN SUPPORT OF
     HER PETITION FOR REVIEW - 24
     [Case No. C07-5685 BHS]

should not be teaching.

*Id.* at 6-7.

Then, in its motion to amend its probable cause letter solely to include "additional times that Ms. Capo had violated these directives" the District argued that *Hoagland* was the case which "sets forth factors to consider whether a teacher's conduct away from school is sufficiently objectionable that the school district employing the teacher may discharge the teacher." District's Motion to Amend, *supra*, at 2-3.

Finally, in his closing argument, counsel for the District stated: "The court, the arbitrator [sic] has to be guided by the *Hoagland* factors in this case. TR III 96:9-10.

## IV. QUESTIONS PRESENTED

A.      Are the hearing officer's Findings of Fact 21, 23, 24, 26 and 29 actually either conclusions of law or mixed questions of fact and law that should be reviewed *de novo*? In the alternative, if they are findings of fact, based on the disputed Findings and the substantial evidence in the record, are they clearly erroneous?

B.      Did the hearing officer err as a matter of law by concluding that "Ms. Capo's actions in resuming frequent contact with L.B. [sic] while under a reasonable stay away order constitute serious, substantial, ongoing insubordination which is not remediable? Conclusion of Law 2.

C.      Did the hearing officer err as a matter of law by refusing to apply the *Hoagland* factors in determining whether the School District had sufficient cause to terminate Ms. Capo for insubordination? Conclusion of Law 3.

D.      Did the hearing officer err as a matter of law concluding that the School

PETITIONER/PLAINTIFF CAPO'S
MEMORANDUM IN SUPPORT OF
HER PETITION FOR REVIEW - 25
[Case No. C07-5685 BHS]

THE ROSEN LAW FIRM
Suite 1200 Hoge Building 705 Second Avenue
Seattle, WA 98104-1798
(206) 652-1464